875 F.2d 864
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
James A. HUEY; Milton Y. Toombs; Martha E. Toombs,
Plaintiffs-Appellees,
v.
DELOITTE, HASKINS & SELLS, a partnership; Defendant-Appellant,
Dyersburg Production Credit Association, a corporation,
Defendant-Appellee.
 Nos. 88-5205 to 88-5207.
 United States Court of Appeals, Sixth Circuit.
 May 15, 1989.
 
 Before BOYCE F. MARTIN, Jr., KRUPANSKY and MILBURN, Circuit Judges.
 PER CURIAM.
 
 
 1
 James Huey and Milton and Martha Toombs filed this action in October, 1982. In their complaint they alleged that Deloitte, Haskins & Sells and Dyersburg Production Credit Association had: (1) violated section 12(2) and section 17(a) of the Securities Act of 1933 and section 10(b) and rule 10(b)(5) of the Securities Exchange Act of 1934; (2) breached their fiduciary duty; (3) committed fraud and deceit; and (4) committed professional negligence. The district court dismissed allegations based on violations of section 17(a) of the Securities Act of 1933. After a lengthy discovery period the case went to trial and was submitted to a jury. The jury returned a verdict in favor of Huey and Toombs in the amount of $35,000 each against Haskins & Sells for the claims of professional negligence. The jury found for Dyersburg Production Credit on the claims against them.
 
 
 2
 Huey and Haskins & Sells each filed a timely notice of appeal on January 29, 1988. James Huey seeks a new trial on the issue of damages against Haskins & Sells and a new trial on the issues of liability and damages against Dyersburg Production Credit. Haskins & Sells seeks a new trial on the issue of professional negligence. Milton and Martha Toombs did not appeal. We affirm the judgment of the district court.
 
 
 3
 James Huey is a lumber manufacturer and investor in western Tennessee. Prior to this lawsuit, Huey frequently did business with Dyersburg Production Credit Association. Dyersburg Production Credit is a commercial money lending institution whose primary business is loaning money to those involved in agribusiness. On a visit to Dyersburg Production Credit in May, 1979, Huey was encouraged by Frank Burnett, a vice president at Dyersburg Production Credit, and Danny Carpenter, an assistant vice president, to invest in a dairy cattle investment program managed by Herbert Freel.
 
 
 4
 Under Freel's program, investors purchased calves which were then fed and cared for by Freel for a set fee. At the end of two years, the calves would become milk producing cows. For the next seven years, Freel would make monthly payments to investors from their proportionate share of the milk revenues. At the end of seven years, Freel would sell the cows for meat, but would replace each cow sold with a new heifer. Investors also had the option of starting with mature milk producing cows rather than calves.
 
 
 5
 Both Burnett and Carpenter described this program to Huey in great detail and in glowing terms. Burnett explained that Freel was the largest independent dairyman in the world, that both he and Carpenter owned cows in Freel's program, and that Dyersburg Production Credit had been doing business with Freel for a number of years.
 
 
 6
 Several days later, Burnett and Carpenter made a visit to Huey's home to discuss the Freel investment. They encouraged Huey to invest in Freel's dairy operation and invited him to fly to Florida to tour Freel's dairy facilities at Sunnyhill Farms. Huey made this visit sometime between May 7 and June 29, 1979. Upon his return to Tennessee, Huey was repeatedly called by Burnett who continued to encourage him to invest in Freel's program. Shortly thereafter, Freel flew to Tennessee and met with Huey.
 
 
 7
 The day after his meeting with Freel, Huey called Bill MaGee, an accountant at Haskins & Sells in Memphis. They arranged a meeting at Haskins & Sells' Memphis office between Huey, Freel, MaGee and Harold Levell, a tax partner at Haskins & Sells in Memphis. At this meeting, MaGee questioned Freel extensively about the structure and soundness of Freel's dairy operation. Apparently, MaGee advised Huey not to do anything until he consulted with Haskins & Sells' Miami office. Freel had told Huey and MaGee that Haskins & Sells was the accounting firm for his dairy operation in Florida. Several days later, MaGee phoned Huey back and informed him that after having been in contact with the Miami office, he was certain that the investment was "a hundred percent good, prudent investment."
 
 
 8
 On June 29, 1979, Huey again called Levell who in turn called Van Clark in Haskins & Sells' Miami office. Clark told Levell that Freel was not a client of Haskins & Sells. Clark also told Levell that Freel was attempting to purchase McCarther Dairies which was a client of Haskins & Sells. He informed Levell that Freel was attempting to obtain a $7 million loan in order to complete this purchase. Levell failed to provide Huey with this crucial financial information.
 
 
 9
 Later that same day, Danny Carpenter again went to Huey's house to persuade him to invest in Freel's dairy cattle program. This time Huey agreed to invest in the program if Freel would agree to certain additional terms. Freel did agree to these terms. The two then entered into an investment agreement over the telephone which Carpenter memorialized with a signed piece of paper. Huey subsequently made another purchase of cows from Freel in December, 1979.
 
 
 10
 Milton Toombs, a Memphis businessman, was also encouraged to invest in Freel's dairy program by members of Haskins & Sells' Memphis office. Toombs went to Haskins & Sells seeking estate and tax planning advice sometime in 1979. Levell and MaGee met with Toombs, discussed his general financial situation, and reviewed his existing wills. At this meeting, Toombs expressed an interest in tax shelters. Levell and MaGee offered Toombs some suggestions and provided him with a general brochure about real estate tax shelters.
 
 
 11
 Sometime after this meeting, on or about December 5, 1979, Toombs received a telephone call from MaGee. MaGee reported that he had just met with Herbert Freel and reviewed his dairy investment program. MaGee gave Toombs Freel's telephone number and told him to contact Freel about the program. Toombs contacted Freel and the two arranged a meeting in Memphis for January, 1980. At this meeting, Freel reviewed the program with Toombs and told him to contact Carpenter and Burnett at Dyersburg Production Credit because they had previously invested in Freel's operation. Both men informed Toombs that Freel's dairy operation was a good investment. Toombs eventually purchased fifty heifers in the Freel program.
 
 
 12
 In January, 1981, Freel's dairy operation went bankrupt. Both Huey and the Toombs received nominal amounts for their investments from the bankruptcy trustee.
 
 
 13
 On appeal, Huey argues that he is entitled to a new trial on the issue of damages because the jury awarded him the same amount as it awarded Milton and Martha Toombs. Because Huey invested more than ten times the amount of the Toombs, Huey argues that the damage awards are somehow inconsistent. The size of the verdict for Huey constitutes a rational determination by the jury of the reasonably foreseeable net losses that were proximately caused by Haskins & Sells' negligence. A jury may award a plaintiff whatever it chooses, so long as the amount is not unreasonable or grossly inadequate. "Because the verdict was within the universe of possible awards, and was supported by the evidence, the jury's verdict must stand." Milton v. City of Cleveland, 839 F.2d 240, 250 (6th Cir.1988), citing Miles v. Vicksburg Chemical Co., 588 F.2d 512, 517 (5th Cir.1979).
 
 
 14
 Huey also argues that the district court failed to charge the jury with an instruction for finding a primary violation of section 10(b) and rule 10b-5 of the Securities Exchange Act of 1934. 15 U.S.C. Sec. 78j(b), 17 C.F.R. Sec. 240.10b-5. This argument is also without merit. The court correctly charged the jury that Freel committed a primary violation and that the liability of the defendants, if any, was in aiding and abetting Freel. The district court thus lowered the burden of proof for Huey. See e.g. Securities and Exchange Commission v. Coffey, 493 F.2d 1304, 1316 (6th Cir.1973), cert. denied, 420 U.S. 908 (1975).
 
 
 15
 Huey also argues that the district court failed to charge the jury with his special instruction regarding the definition of "knowledge" under a violation of section 10(b) and rule 10b-5. This argument fails because the court used the same language in its jury instruction as that found in Mansbach v. Prescott Ball & Turben, 598 F.2d 1017, 1023 (6th Cir.1979), the opinion in which this Court defined scienter in terms of recklessness.
 
 
 16
 Haskins & Sells argues that because contributory negligence is a complete bar to recovery by a plaintiff in Tennessee, regardless of any negligence on the part of the defendant, see McElroy v. Boise Cascade Corp., 632 S.W.2d 127 (Tenn.App.1982), recovery should be denied to Huey and the Toombs. Haskins & Sells asserts that both Huey and the Toombs were contributorily negligent in relying upon the advise provided by Haskins & Sells.
 
 
 17
 This argument is without merit. Haskins & Sells never developed any proof of contributory negligence at trial regarding the charge of professional negligence. It never suggested that either Huey or the Toombs should seek an independent verification of the soundness of their investment advice. Finally, Haskins & Sells failed to request the district court to instruct the jury on contributory negligence. Fed.R.Civ.P. 51 provides that "no party may assign as error the giving or failure to give an instruction ..." This court has held that in the absence of objection to the court's instructions, those instructions are not reviewable. See Murphy v. Owens-Illinois, Inc., 779 F.2d 340 (6th Cir.1985).
 
 
 18
 The parties raise numerous other issues, none of which warrant discussion. The judgment of the district court is affirmed.